**COMMONWEALTH of Pennsylvania,**
**Appellant**

v.

**Kenneth F. SODOMSKY, Appellee.**

Superior Court of Pennsylvania.

Argued Jan. 9, 2007.
Filed Dec. 5, 2007.
Reargument Denied Feb. 7, 2008.

Adrian S. Shchuka, Assistant District Attorney, Reading, for Commonwealth, appellant.

Paul D. Boas, Pittsburgh, for appellee.

BEFORE: BENDER, BOWES and COLVILLE *, JJ.

OPINION BY BOWES, J.:

¶ 1 The Commonwealth appeals from the trial court's November 9, 2005 order suppressing evidence.[1] After careful review, we reverse.

When reviewing a suppression order we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence from the prosecution that, when read in the context of the entire record, remains uncontradicted. We are bound by the trial court's findings of fact if those findings are supported by the record, but are not bound by its conclusions of law. *Common-*

wealth v. Chernosky, 874 A.2d 123 (Pa.Super.2005).

*Commonwealth v. Steward,* 918 A.2d 758, 759 n. 1 (Pa.Super.2007).

¶ 2 The evidence of this matter reveals the following pertinent facts. Richard Kasting was the senior sales assistant in the technology department of the Circuit City Store located on Woodland Road, Wyomissing, Berks County. Mr. Kasting testified that on October 15, 2004, Appellee, Kenneth Sodomsky, came to Circuit City and asked Mr. Kasting to install an optical drive and DVD burner into his computer. The work order that Appellee executed that day authorized Circuit City to install and configure the optical drive unit and DVD in his desktop computer.

¶ 3 In accordance with store practice, Mr. Kasting summarized to Appellee "what is done during the installation." N.T. Suppression Hearing, 9/28/05, at 16. Appellee was informed that as part of the installation process, the installer would "have to make sure [the DVD burner] works." *Id.* at 17. There is no indication that Appellee asked how the DVD burner would be tested or in any manner restricted what procedure could be utilized to confirm the burner's operability. Appellee requested that the work be performed on an expedited basis, and Mr. Kasting instructed him to return in approximately one hour.

¶ 4 Toby Werner was in the middle of the installation process when Stephen Richert, the head of personal computer repairs at that Circuit City, arrived. Mr. Richert testified that the DVD drive was installed when he arrived in the department, but the software had not yet been

---

* Retired Senior Judge Assigned to the Superior Court.

1. In its notice of appeal, the Commonwealth certified that the order substantially handi- caps its prosecution of this matter; we therefore have jurisdiction pursuant to Pa.R.A.P. 311(d).

installed. Mr. Richert explained that all DVD burners and players were accompanied by software.[2] Mr. Richert testified specifically that at Circuit City, with "every installation" of the hardware, "any supplementary software" was installed both as a courtesy "and to make sure when it leaves the store, we can guarantee that it is working." *Id.* at 21.

¶ 5 After the software was installed, Mr. Richert performed a general search for a video to test the new DVD drive. More specifically, he testified as follows:

Well, after we installed the software, we did a generic search of the PC where you click on the start menu, you click on search, and this being the windows XP, a search box comes up and it is custom made to this operating system. In this case, this system, it's about half way down the screen on the left-hand side there's a search, and you can enter—in this case, you could enter a specific name of a file that you're looking for and find it.

We weren't looking for anything specific, so we did a generic search. Below the field where you could enter the name of a file that you are looking for, you can click on the generic boxes listed, picture, movie or if you click it, it does a general search of the whole PC and finds any of that type of objects that you're looking for. In this case, we clicked movies or video, and it brings up all the different formats of videos.

There are many different types of video formats. There's M-peg, MPG–4, AVI, Quick Time. Any types of those files, if used to place on Windows Media Player, which is a program that's inherent to PC when running windows XP or

to the DVD software, in certain circumstances, if you install the software and it wasn't installed properly or you didn't receive notification and you try to play the files or play a DVD movie on the PC, you get distortion that isn't necessarily seen right away when you install it.

So, in this case, we wanted to make sure that all types of files were working fine so that you wouldn't get any type of errors. When you install the different type of software, there's something called code X. It's a little piece of software inside the PC that helps the PC better understand and translate video signals through different players.

So, in this case, if we play a movie file and we get distorted colors or blurring of the image or a ghosting effect where all color is inverted, we know there is a problem with the installation and we have to find it and fix it. If there is a software update, we have to uninstall and reinstall it, if there was an issue. *Id.* at 22–23.

¶ 6 Mr. Richert testified that once the search button was activated for a given object, the computer automatically loaded the requested files onto the screen, which continued to enlarge by itself. Thus, after the search was initiated, Mr. Richert did not manipulate the computer further to see the entire list of videos *Id.* at 30–31. The first few video titles that appeared from Appellee's video list were innocuous. However, as the video log continued to compile on the computer screen, which occurred without any human intervention, some of the files appeared to be pornographic in nature due to their titles which included masculine first names, ages of

---

**2.** Appellee maintains that he did not request installation of the DVD software. Appellee's brief at 3. However, it is clear that Circuit City could not test the hardware without installing the software and always installed any software accompanying a hardware installation. Appellee was told that the hardware would be tested.

either thirteen or fourteen, and sexual acts. Mr. Richert clicked on "the first one" that appeared questionable, and the video contained the lower torso of an unclothed male, and when a hand approached the male's penis, Mr. Richert immediately stopped the video. *Id.* at 24. Mr. Richert contacted his manager and then telephoned the Wyomissing police.

¶ 7 During cross-examination, Mr. Richert admitted that he had been told by a Pennsylvania State Police Officer to contact police if he ever ran across what appeared to be child pornography while at work. At the time, Mr. Richert was taking a course at a local college and hoped to enter the law enforcement field.

¶ 8 Wyomissing Police Detective George Bell and two other police officers responded to the call and viewed the same video clip. When Appellee arrived to retrieve his computer, Detective Bell informed him that his computer was being seized because police suspected that it contained child pornography. Appellee responded that he knew what they had found and that his "life was over." *Id.* at 87. Police took the computer to the police station, obtained a warrant to search it, and discovered child pornography.

¶ 9 On appeal, the Commonwealth maintains that the trial court erred in concluding that Appellee retained a privacy interest in the computer because he volitionally relinquished any expectation of privacy in that item by delivering it to Circuit City employees knowing that those employees were going to install and test a DVD drive. We agree in part with this contention.

¶ 10 We begin our discussion with *Commonwealth v. Shoatz*, 469 Pa. 545, 366 A.2d 1216 (1976), which extensively analyzes whether individuals have the right to contest the search of their personal property after they have abandoned a privacy interest in that item. In *Shoatz*, police were

investigating a report that three men were acting suspiciously and appeared to be preparing to burglarize a store. Police initiated surveillance of the threatened premises and shortly thereafter observed three men, two of whom were carrying suitcases, appear in an alley adjacent to the store. One of the officers approached the men and asked to speak to them. The two men who were carrying suitcases dropped them, and all of the men fled. Police searched the suitcases and discovered illegal weapons. The defendants, who were immediately apprehended, raised constitutional objections to the search of their suitcases. Our Supreme Court concluded that when the defendants dropped their suitcases and ran, they abandoned that property and thus, were not entitled to contest the search.

¶ 11 The Court noted that Pennsylvania has adopted the theory of abandonment, which applies as long as improper police conduct did not induce a defendant's desertion of his personal property. Pursuant to this legal construct, when an individual evidences an intent to relinquish control over personal property, he or she has abandoned a privacy interest in property and cannot object to any ensuing search of the item by police. Abandonment revolves around the issue of intent, which is determined from words, acts, and all relevant circumstances existing at the time the property is purportedly deserted. *Accord Commonwealth v. Sanders*, 407 Pa.Super. 270, 595 A.2d 635, 638 (1991) ("whether a person reasonably may expect that his or her possessions shall be free from unwarranted governmental intrusion depends on the facts and circumstances").

¶ 12 As the *Shoatz* Court explained, "The issue is not abandonment in the strict property-right sense, but whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise

relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search." *Shoatz, supra* at 553, 366 A.2d at 1220.

¶ 13 The theory of abandonment is extrapolated from the United States Supreme Court's observation that "the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Katz v. United States,* 389 U.S. 347, 351–52, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (citations omitted); *see also Oliver v. United States,* 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984) (defendant did not have reasonable expectation of privacy in his visible real estate containing marijuana).

¶ 14 Our Supreme Court has more recently examined the principle in *Commonwealth v. Hawkins,* 553 Pa. 76, 718 A.2d 265 (1998). In that case, the defendant handed an item to another individual, who then placed it in his mouth. Police seized the individual and extracted the property, which consisted of illicit drugs. Our Supreme Court refused to allow the defendant to object to the seizure of the drugs, noting that under current Fourth Amendment jurisprudence, a defendant cannot object to a search unless he establishes a legitimate expectation of privacy "in the area searched or effects seized" and that such interest also must be sanctioned by society as reasonable and justifiable. *Id.* at 81, 718 A.2d at 267. It continued that a "legitimate expectation of privacy is absent where an owner or possessor meaningfully abdicates his control, ownership, or possessory interest" in his personal property. *Id.* at 81–82, 718 A.2d at 267. The Court

concluded that the defendant had abandoned his expectation of privacy in the drugs by handing them to the drug purchaser and that he had no legitimate expectation of privacy in that individual's mouth. It also refused to grant the defendant derivative standing to object to the search of the drug purchaser's body under the Pennsylvania Constitution.

¶ 15 In the present case, we limit our inquiry to a determination of whether Appellee's expectation of privacy in the videos on the computer that he relinquished to Circuit City employees for repairs was reasonable or whether he knowingly exposed the computer's video files to the public such that he voluntarily abandoned his privacy interest in them. The trial court found that Appellee did retain a privacy interest in the contents of the computer, reasoning that he did not expect the computer's contents "to be published to anyone other than employees of Circuit City as needed to complete the requested installation." Trial Court Opinion, 3/6/06, at 7. In reaching this conclusion, the trial court noted that Appellee did not give Circuit City employees the right to delete files, access financial information, or access his e-mail and so thereby did not lose "all subjective" expectation of privacy in his computer. *Id.* at 8. Thus, the trial court found the subsequent seizure of the computer to be illegal.

¶ 16 The trial court analogized this case to *Commonwealth v. Davis,* 743 A.2d 946 (Pa.Super.1999), wherein we held that a tenant did not relinquish his privacy interest in an apartment merely because the landlord had limited access rights to the apartment and that the landlord could not, therefore, consent to a warrantless search of the apartment. Similarly, in *Commonwealth v. DeJohn,* 486 Pa. 32, 403 A.2d 1283 (1979), the Supreme Court found that under the Pennsylvania Constitution, a

person retains a privacy interest in bank records, and further held that a bank cannot submit the records to the police in the absence of a search warrant. The *DeJohn* decision was based primarily on the fact that an individual's disclosure of financial records to a bank was not entirely voluntary in that one cannot participate in modern society without obtaining a bank account. The *DeJohn* Court also observed that a customer discloses his financial records to a bank for a limited purpose, to aid in conduct of financial affairs, and that a customer's expectation of privacy is not diminished merely because a bank maintains the records.

¶ 17 Initially, we must observe that the trial court did not employ the proper legal standard. First, the court focused on the irrelevant question of whether Appellee gave Circuit City employees access to financial records and e-mail files. These items were not searched; what Appellee did **not** give employees permission to do is not the consideration. We must examine whether he did give access or knowingly risk access to his video files, which were the items discovered herein. Furthermore, contrary to the trial court's conclusion, if Appellee exposed the video contents of his computer to Circuit City employees, he abandoned his privacy interest in those computer contents because those employees were members of the public. If Appellee knowingly published his computer video files to members of the public, he had no reasonable expectation, under the applicable law, that the video files would not be disseminated to other individuals, including police.

■ ¶ 18 As noted, abandonment is a question of intent and dependent upon all the attendant facts and circumstances. In accordance with this pertinent standard, we therefore will scrutinize all the facts and circumstances to determine whether Appellee retained a reasonable expectation of privacy in his videos. First, we observe that Appellee gave the employees permission to perform certain actions relative to his computer files. He requested and consented to the installation of a DVD drive and was specifically informed that the drive's operability would be tested by Circuit City employees. Appellee failed to either inquire as to how the DVD drive would be tested or otherwise restrict the employees' access to his computer files for that purpose. Thus, Appellee should have been aware that he faced a risk of exposing the contents of his illegal video files. *Cf. United States v. Barth*, 26 F.Supp.2d 929 (W.D.Tex.1998) (computer owner did not lose reasonable expectation of privacy in computer files contained in searched hard drive because owner gave repairman, a confidential informant, hard drive for limited purpose of repairing problem unrelated to files that were searched).

¶ 19 We also find it critical to our analysis that when the child pornography was discovered, the Circuit City employees were testing the DVD drive's operability in a commercially-accepted manner rather than conducting a search for illicit items. *Cf. Barth, id.* Appellee implies that the DVD drive should have been tested by inserting and playing a DVD. Appellee's brief at 3. Nevertheless, as noted, Appellee did not ask how the burner would be tested nor did he place any restrictions regarding the manner of that procedure. As Mr. Richert's testimony indicated, the playing of videos already in the computer was a manner of ensuring that the burner was functioning properly. Once the search for videos was initiated, the list of Appellee's videos appeared automatically on the computer screen. The employee testing the burner was free to select any video for testing purposes, as Appellee had not restricted access to any files. Therefore,

Mr. Richert did not engage in a fishing expedition in this case.

¶ 20 The final factor we utilize is the volitional nature of Appellee's actions. In this case, Appellee removed the computer from his home, took the computer to Circuit City, and left it there without either removing the videos containing child pornography or changing the titles of the videos so that they did not appear to have illegal content. Contrary to the circumstances in *DeJohn, supra*, where a person has little choice but to retain bank accounts in order to function in society, Appellee was not compelled to take this particular computer containing child pornography to the store in the first instance, nor was he forced to leave it there after being informed that the burner's operability would be checked. Appellee was aware of the child pornography and could have elected to leave the store with the computer rather than risk discovery of the pornographic files.

¶ 21 This scenario also stands in contrast with the landlord case relied upon by the trial court. Although landlords routinely retain the right to inspect their premises upon notice, people still retain a privacy expectation in their home despite its status as rental property. Here, however, we find that under the facts and circumstances presented, Appellee knowingly exposed to the public, the Circuit City employees, the contents of his video files. It is clear that Circuit City employees were members of the public; hence, if Appellee knowingly exposed the contents of his video files to them, as members of the public, he no longer retained an expectation of privacy in those videos nor could he expect that they would not be distributed to other people, including police.

¶ 22 As noted, the trial court overlooked the attendant facts and circumstances in this case and improperly focused upon what access rights Appellee had not granted to the Circuit City employees. While the trial court may or may not be correct that Appellee retained a privacy interest in other computer files, such as e-mail or financial records,[3] he did not retain a privacy interest in his videos under the facts and circumstances herein.

¶ 23 Since Appellee abandoned his privacy interest in the videos contained in the computer, he cannot object to the subsequent viewing of the video list and file by police. As noted, our decision is firmly rooted in current Pennsylvania authority; we therefore reject Appellee's independent reliance on the Pennsylvania Constitution to protest the police actions in this case.

■ ¶ 24 Our result in this case is consistent with the weight of authority in this area. If a person is aware of, or freely grants to a third party, potential access to his computer contents, he has knowingly exposed the contents of his computer to the public and has lost any reasonable expectation of privacy in those contents. *E.g. United States v. Simons*, 206 F.3d 392 (4th Cir.2000) (where employee was informed that his work-related internet activity would be scrutinized by employer, he had no legitimate expectation of privacy in fruits of his internet activity as he knowingly exposed such activity to public); *United States v. King*, 2006 WL 3421253 (M.D.Ala.2006) (defendant knowingly exposed personal files to public under *Katz* by linking to network after being informed

---

**3.** Since Appellee's e-mail and financial records were not searched, we need not analyze the propriety of the trial court's conclusion that he retained a privacy interest in those files. *But see Commonwealth v. Proetto*, 771 A.2d 823 (Pa.Super.2001), *aff'd*, 575 Pa. 511, 837 A.2d 1163 (2003) (defendant does not have reasonable expectation of privacy in contents of sent e-mail and chat rooms).

that personal files could and would be searched using network even though defendant attempted to protect files from network search); *Lown v. State,* 172 S.W.3d 753 (Tex.App.2005) (defendant did not have reasonable expectation of privacy in files on work computer which were backed up at request of people in authority at defendant's company).

¶ 25 As an alternative basis to affirm, Appellee argues that Mr. Richert was acting as an agent of the police when he viewed the pornographic file. However, the theory of abandonment applies specifically to searches conducted by police. Since we find that Appellee abandoned any reasonable expectation of privacy in the contents of the videos, he cannot prevail in his suppression motion regardless of who conducted the search.

¶ 26 Appellee also suggests that the seizure of the computer was improper because it was accomplished without a warrant. We agree with the Commonwealth's assertion that the plain view exception to the warrant requirement applied herein. The plain view doctrine provides that evidence in plain view of the police can be seized without a warrant, *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), as modified by *Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990), and it was adopted by our Supreme Court in *Commonwealth v. McCullum,* 529 Pa. 117, 602 A.2d 313 (1992). The plain view doctrine applies if 1) police did not violate the Fourth Amendment during the course of their arrival at the location where they viewed the item in question; 2) the item was not obscured and could be seen plainly from that location; 3) the *incriminating* nature of the item was readily apparent; and 4) police had the lawful right to access the item. *Horton, supra; McCullum, su-*

*pra; accord Commonwealth v. McCree,* 592 Pa. 238, 924 A.2d 621 (2007).

¶ 27 In the present case, police did not violate the Fourth Amendment in arriving next to the computer. Circuit City, which owned the premises, had granted them permission to enter the repair area though their on-site employees. *Accord McCullum, supra* (where police had permission of tenant to be in apartment, they had lawful vantage point from which to view incriminating evidence); *cf. Commonwealth v. English,* 839 A.2d 1136 (Pa.Super.2003) (police had plain view of marijuana growing on defendant's porch but violated Fourth Amendment by entering onto premises without warrant, consent, or exigent circumstances; plain view doctrine therefore did not apply). The videos were not obscured in that they could be seen readily from that location.

¶ 28 We also conclude that the incriminating nature of the video files was immediately apparent. Appellee suggests that it was unclear whether the videos depicted child pornography because police could not ascertain the age of the naked male, whose face was not revealed, from the portion of the video that they viewed. We disagree. Appellee ignores the titles assigned to the videos on his computer. Mr. Richert stated that the titles listed a masculine name, an age of either thirteen years old or fourteen years, and "different types of sexual acts." N.T. Suppression Hearing, 9/28/05, at 24. The video titles, together with the clip of a naked male with a hand reaching for the penis, made it "readily apparent" that the videos were of illegal child pornography. Finally, police had the lawful right to access the videos because, as analyzed extensively above, Appellant had abandoned any reasonable expectation of privacy in them.

¶ 29 Order reversed. Case remanded. Jurisdiction relinquished.

¶ 30 Judge Colville files a Concurring Opinion.

Concurring Opinion by COLVILLE, J.:

¶ 1 Appellee's challenge must fail because he did not retain a reasonable expectation of privacy in the videos contained in the computer after delivering it to Circuit City. There being no reasonable expectation of privacy, I would not engage in the Majority's plain view analysis. *See Commonwealth v. Viall,* 890 A.2d 419, 422 (Pa.Super.2005) (holding that a defendant cannot prevail in a challenge to the search and seizure of evidence if the defendant does not have a legally cognizable expectation of privacy in the property searched).

¶ 2 For these reasons, I concur in the result.